612 A.2d 305

**UNIVERSITY OF MARYLAND AT BALTIMORE**

v.

**Donald BOYD.**

**No. 1751, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Sept. 8, 1992.

**304**

William F. Howard, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Andrew H. Baida, Asst. Atty. Gen., on the brief), Baltimore (Meryl L.K. Eddy, Assistant University Counsel of Baltimore, on the brief, of counsel), for appellant.

Lee D. Hoshall, Asst. General Counsel (Michael L. Foreman, General Counsel, on the brief), Baltimore, for appellee.

Argued before BISHOP, FISCHER and HARRELL, JJ.

FISCHER, Judge.

The University of Maryland at Baltimore (University), appellant, appeals an order of the Circuit Court for Balti-

more City affirming a decision of the Maryland Commission on Human Relations (Commission) Appeal Board. This case stems from a violation of the dress code for the University's police officers. Donald Boyd, appellee, was employed as a police officer for the University. For many years, a dress code has been in effect and has prohibited University police officers from wearing a beard. In May of 1983, Mr. Boyd, with a growth of beard, returned from two weeks leave. When Mr. Boyd returned, he was reprimanded for violating the grooming policy. Mr. Boyd explained that he had a medical reason for the growth of beard, and consequently, the University placed him on medical leave in order to document, evaluate, and treat the condition. Mr. Boyd remained on medical and sick leave until July 20, 1983, when his leave balances were exhausted. Mr. Boyd, however, remained employed by the University until April 12, 1984.

On May 25, 1983, Mr. Boyd filed a grievance under the University of Maryland classified employees' grievance procedure. Mr. Boyd alleged that the University improperly forced him to use his accumulated sick leave and that the University should permit him to work unshaven. The grievance was filed under Md.Educ.Code Ann. § 13–1A–03 (1983 Cum.Supp.) which provides for a five step administrative process. Mr. Boyd's grievance was given *de novo* consideration at each step. The final step included a hearing before the Department of Personnel. This hearing was conducted on November 14, 1984 before a hearing officer selected by the Secretary of Personnel. The issues addressed at the hearing concerned whether the University's grooming policy was a business necessity or whether the policy improperly discriminated against handicapped and black individuals. The Secretary of Personnel concluded, on June 13, 1985, that "because Mr. Boyd [had] not ... proven discrimination on the basis of handicap and/or race, his grievance must be denied."

On August 17, 1983, Mr. Boyd also filed a complaint with the Commission. On July 27, 1988, the Commission filed a

formal Statement of Charges alleging that the University had violated Md.Ann.Code, Art. 49B, § 16(a) and had discriminated against Mr. Boyd. Subsequently, the University filed a motion claiming that the charges should be dismissed because the previous hearing, before the Secretary of Personnel, barred any further proceedings on the issue. On January 20, 1989, the Commission's hearing examiner denied this motion. A hearing was held during several days in March and April of 1989, and the examiner issued, on June 29, 1990, an opinion finding that Mr. Boyd suffers from a skin condition known as pseudofolliculitis barbae (PFB) which predominantly affects black males. The examiner concluded that the University had discriminated against Mr. Boyd on the basis of race but not on the basis of a physical handicap. The hearing examiner provisionally awarded Mr. Boyd reinstatement and backpay in the amount of $22,591.

Both parties appealed the proposed decision of the hearing examiner. The Commission affirmed the hearing examiner's conclusions regarding the issues of *res judicata* and race discrimination, but it reversed the hearing examiner's conclusion that the University had not discriminated on the basis of a physical handicap. The University appealed this decision to the Circuit Court for Baltimore City, which affirmed, without opinion, the Commission's decision. The University now appeals the circuit court's decision and asks us to answer the following questions:

1. Do the principles of *res judicata* bar the Commission's action against the University because the claims presented in this action are identical to claims adjudicated against Mr. Boyd in a prior proceeding before the Secretary of Personnel?

2. Does the University's policy prohibiting beards have a disparate impact on African American employees when that policy was shown to have an adverse effect on one employee only and no one else in the University's workforce?

3. Does substantial evidence support the hearing examiner's findings that Mr. Boyd's condition was not a physical handicap and that it did not substantially limit any of his major life activities?

4. Is the award of backpay supported by substantial evidence when no evidence was introduced in the administrative proceedings showing what Mr. Boyd would have earned had he remained employed by the University?

## I.

First, the University avers that Mr. Boyd is barred by the doctrine of *res judicata* from submitting a complaint under Article 49B of the Annotated Code because the same issue was previously adjudicated under the University's grievance procedure. The University claims, and we do not disagree, that in some situations, the Secretary of Personnel's decisions are given *res judicata* effect. We do not agree, however, that the Secretary's decision, which concluded that the University did not discriminate against Mr. Boyd, bars the adjudication of his complaint filed with the Commission.

*Res judicata* generally precludes "the relitigation of matters that have been fully and fairly litigated and finally decided between the parties, by a tribunal of competent jurisdiction." *Murray Int'l Freight Corp. v. Graham,* 315 Md. 543, 547, 555 A.2d 502 (1989). The Court of Appeals, in *Murray Int'l,* also explained that, under the doctrine of *res judicata,* an administrative agency decision is subject to the same treatment as the decision of a court. The University claims that the issue Mr. Boyd raised before the Commission is identical to the issue decided by the Secretary of Personnel—whether the "rule prohibiting the wearing [of] a beard by University Police officers [should] be upheld or should it be set aside because it is not a necessity of business and discriminates against the handicapped and Blacks." Consequently, the University contends that Mr. Boyd's complaint filed with the Commission is precluded by

the Secretary's decision that the grooming policy is not discriminatory.

In *Cicala v. Disability Review Board*, 288 Md. 254, 418 A.2d 205 (1980), the Court of Appeals considered whether a quasi-judicial determination by an agency is binding upon another determination of apparently the same issue but which arises under a separate statute. In *Cicala*, a Prince George's County police officer applied to the Disability Review Board for disability benefits. The Board denied the officer the extra service-related benefits because it found that his disability was not service related. The police officer contended that the Board erred because it did not consider a finding of the Workers' Compensation Commission that the injury was employment related. In effect, the police officer claimed that the doctrine of *res judicata* precluded the Board from making its own finding on the issue of whether his injury was service related. The Court of Appeals held that the Board was not precluded from issuing its own finding.

The Court of Appeals, in *Cicala*, set out the rationale for determining whether an administrative agency's finding should be given *res judicata* effect by another agency deciding the ·same issue under a different statute. The Court stated that *res judicata* did not usually apply in such situations and reasoned that "although the issues before the two administrative agencies may appear to be identical, generally they are not. This is so because different statutes have different legislative histories, purposes, scopes of coverage, language, standards, procedures, and policies which may dictate opposite results." *Cicala*, 288 Md. at 265, 418 A.2d 205. The Court analyzed the relationship between the Disability Board Plan and the Worker's Compensation Act. The Court found that each statute has a different origin, scope of coverage, funding sources, and procedures. The Court especially focused on the differing procedural processes; the Worker's Compensation Commission has power to subpoena witnesses and to conduct its own investigation, whereas the Disability Board has no

power to subpoena and must rely on the written opinion of a committee before it can make its own determination. The Court stated, "[T]hese seemingly minor procedural differences may have substantial impact because they may result in the presentation to the Commission and the Board of different facts upon which to base their respective decisions." *Cicala*, 288 Md. at 266, 418 A.2d 205. The Court also focused on the fact that the Board's plan and the Commission's act set out the issue, as to whether the injury was employment related, in differing language and terms.

Applying the *Cicala* rationale to Article 49B of the Annotated Code, which governs the Human Relations Commission, and to Section 13–1A–03 of the Educ. Article, which governs University employee grievance procedures, we conclude that the doctrine of *res judicata* does not bar the Commission from resolving a complaint filed under Art. 49B even though the Secretary of Personnel has previously resolved a § 13–1A–03 grievance involving the same matter. There are substantial differences in the policies and procedures surrounding Article 49B and § 13–1A–03. Section 13–1A–01 defines "grievances" under Subtitle 1A as between "a classified employee and his employer on a matter concerning discipline, alleged discrimination, promotion, assignment, or interpretation or application of University rules or departmental procedures over which the University management has control." Article 49B covers a much broader scope and was enacted to protect the rights of all Maryland residents in three major areas—housing, employment, and public accommodations. Section 5 governs unlawful discrimination in public accommodation; § 14 prohibits discrimination in employment practices; and § 19 prohibits discrimination in housing. Section 3 of Article 49B authorizes the Commission to "make surveys and studies concerning human relations, conditions and problems, and it may promote in every way possible the betterment of human relations."

The procedural processes employed under Article 49B and § 13–1A–03 also differ. Article 49B provides for "an elabo-

rate scheme for investigation, findings of facts, negotiation toward voluntary settlement and an enforcement procedure including access to the courts if a final order is not complied with or if temporary injunctive relief is deemed appropriate by the Commission." *Dillon v. Great Atl. & Pac. Tea Co.,* 43 Md.App. 161, 164, 403 A.2d 406 (1979) (quoting *Atkins v. Westinghouse Broadcasting Co., Inc.,* Superior Court of Baltimore City, No. 11385 (1977, Docket, Folio 403, Kaplan, J.)). The Commission is charged under Art. 49B, § 9 with conducting a preliminary investigation to determine the merits of the complaint. If the Commission members determine that the information is reliable, the members may issue the complaint in the name of the Commission. By contrast, the version of § 13–1A–03 in effect when Mr. Boyd filed his grievance, only provided for conferences between the employee and various levels of University management. After completing four steps of conferences, the aggrieved employee was then permitted to submit his grievance to the Secretary of Personnel. The Secretary was authorized to hold a hearing but was not obligated to conduct an independent investigation to determine the merits of the claim.

The relief provided under each statute is also different. The Secretary of Personnel under § 13–1A–03 has the power to award backpay to the employee. The Commission, meanwhile, is given broad powers, under § 11(e), to issue an order, based upon a written agreement with the employer, to eliminate discrimination, and to reinstate or hire with or without backpay limited to a two year period, and to award other equitable relief. Consequently, the Commission's order affects a much broader segment of society than the Secretary of Personnel's award to the aggrieved University employee. Most notably, the University grievance procedure is in response to the University's need to settle employee grievances. The Commission, however, is charged with overseeing all aspects of human relations for the residents of Maryland. For these reasons, we believe the two statutes are substantially different in policy, coverage

and procedures. The Secretary of Personnel's finding does not, therefore, have *res judicata* effect upon the Commission's decision.

In addition, Mr. Boyd contends that any *res judicata* effect of the grievance procedures was explicitly avoided under the version of Article 49B, § 7(b)(1) in effect when he filed his complaint. At that time, § 7(b)(1) provided, "[A] state employee making a complaint to the Commission concerning his state employment must first give notice by filing a grievance proceeding, if one is available to him." Mr. Boyd argues that it would be illogical for the General Assembly to have required state employees to file a grievance initially with their employer if the outcome of the grievance had *res judicata* effect against Article 49B claims. We agree. The purpose of the notice provision was to give the State an opportunity to resolve the matter so that the need for Commission action would be obviated. The procedural difficulties which arose from the statute's ambiguity, however, outweighed the judicial economy of the policy. In *Md.–Nat'l Cap. P. & P. Comm'n v. Crawford,* 307 Md. 1, 29, 511 A.2d 1079 (1986), the Court of Appeals spoke of the procedural difficulties that arose from requirements similar to § 7(b)(1), "[I]f we were to construe the pertinent statutes … to require that an employee … invoke and exhaust every administrative scheme applicable to her grievance before bringing an independent judicial action authorized by statute, the burden upon such employee would be great. Moreover, the task of coordinating different judicial review actions and the independent statutory action could be formidable." For these reasons, this requirement was deleted by Ch. 376 of the Acts of 1983 for the purpose of eliminating "the necessity that State employees file a grievance, where one is available, in order to give notice of an employment discrimination complaint filed with the Human Relations Commission." 1983 Md.Laws 376. Thus, employee grievances and claims before the Human Relations Commission are now procedurally independent of one another.

## II.

Second, the University avers that the grooming policy does not have an adverse racial impact on its workforce. The University concedes that the condition known as PFB "disproportionately affects black males in the general population." The University argues, however, that the Commission did not produce evidence that the grooming policy had an adverse impact on African American male University police officers.

 Our review of an administrative agency decision is limited to whether there is substantial evidence to support the agency's conclusion. We may reverse or modify a decision if it is "unsupported by competent, material and substantial evidence in light of the entire record as submitted." Maryland Administrative Procedure Act, State Gov't Art., § 10–215(g)(3)(v). In applying the substantial evidence test, our scope of review is limited to "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Maryland Shipbuilding v. Comm'n on Human Relations,* 70 Md.App. 538, 551, 521 A.2d 1263 (1987) (quoting *Snowden v. Mayor & C.C. of Balto.,* 224 Md. 443, 448, 168 A.2d 390 (1961)). We will not substitute our judgment for the expertise of the agency. *Bernstein v. Real Estate Comm.,* 221 Md. 221, 230, 156 A.2d 657 (1959), *appeal dismissed,* 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960).

The Commission found that, under Article 49B, the University's grooming policy has a disparate impact on Mr. Boyd due to his race and that the discrimination was not justified by a business necessity of the University. Art. 49B, § 16(a) of the Md.Ann.Code states:

(a) It shall be an unlawful employment practice for an employer:

(1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, age, national origin, marital status, or physical, or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

(2) To limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect this status as an employee, because of the individual's race, color, religion, sex, age, national origin, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment.

■ Article 49B is "modeled on Title VII of the Civil Rights Act of 1964. . . ." *Burnett v. Grattan,* 468 U.S. 42, 51, 104 S.Ct. 2924, 2930, 82 L.Ed.2d 36 (1984). Disparate impact claims involve "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters v. United States,* 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). A *prima facie* case of disparate impact must, in the context of this case, identify a specific employment practice that has a significantly disparate impact on African American males. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656–658, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989). A *prima facie* case of disparate impact may be established with general population statistics and there is no need to require that the data reflect the actual employees alleged to be affected by the disparate impact. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

■ The record clearly demonstrates that PFB is a skin condition that mainly affects African American and other African descendant males. Expert witnesses testified that the symptoms of PFB, skin irritation, pus and blood filled sores, and scarring, are brought on by shaving and that

some sufferers of PFB must abstain from shaving. Dr. Irving D. Wolfe, professor of dermatology at University of Maryland Medical School and chairman of the dermatology department of Sinai Hospital, testified that PFB affects approximately forty-five to eighty percent of the African American male population. Dr. Wolfe stated that the severe form of the condition makes it very uncomfortable to shave and that growing a beard would alleviate that discomfort. Dr. Wolfe explained that his examination of Mr. Boyd showed that Mr. Boyd suffered from PFB in the past and that currently Mr. Boyd displayed symptoms of PFB. Dr. Stanford I. Lamberg, professor of dermatology at Johns Hopkins University and chairman of the dermatology department at the Francis Scott Key Medical Center, also testified that PFB was predominately found in African American males and that one cure or treatment of the condition was the growth of a beard.

In defense of its policy, the University argued that grooming standards of police officers are important to reflect the correct public image. This business necessity, however, is outweighed by the discriminatory impact of the policy. Other evidence introduced at the hearing showed that similar organizations with similar grooming policies allowed officers, diagnosed as suffering from PFB, to grow neatly trimmed beards in order to alleviate the condition.

The University argues that the evidence does not prove that the University's policy had any disparate impact on the University's workforce. The University contends that the evidence did not prove that the University's policy has affected any African American male other than Mr. Boyd. The hearing examiner concluded that the "impact of the no-beard policy clearly falls more heavily on blacks than it does on whites" and that the "no beard policy adversely impacts blacks." The University argues that the University employment statistics show that the University employs a higher percentage of African Americans than is found in the labor pool or in other similar agency positions. In *Wards Cove Packing Co.*, 490 U.S. at 653, n. 8, 109 S.Ct. at 2123, n. 8, the Court found that "bottom-line" racial balances, such as

the University's racial employment statistics, are not a defense to adverse impact claims. *See also, Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). The evidence, that PFB is predominately found in the African American male population and that the wearing of a beard is the most common cure, is adequate proof to establish a *prima facie* case under the holding of *Dothard* that the University's grooming policy is discriminatory and adversely affects African American male officers. Therefore, we find the hearing examiner's conclusion, that the University's policy adversely affects the African American male population afflicted with PFB, is supported by substantial evidence in the record.

### III.

▇ Third, the University avers that the Commission erred in reversing the finding of the hearing examiner that Mr. Boyd's condition was not a handicap. The Commission concluded that there was substantial and competent evidence that PFB is a handicap and that the hearing examiner erred in concluding that PFB was not a handicap. The Maryland Code, for purposes of the Commission's activities, defines physical or mental handicap quite broadly:

> Physical or mental handicap—The term physical or mental handicap means any physical disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness including epilepsy, and which shall include, but not limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impairment, muteness or speech impediment, or physical reliance on a seeing eye dog, wheelchair, or other remedial device; and any mental impairment or deficiency as, but not limited to, retardation or such other which may have necessitated remedial or special education and related services.

Md.Ann.Code Art. 49B, § 15(g) (1979).

The Commission found that Mr. Boyd's "PFB condition impaired his appearance, scarred his face and created an

externally visible disfigurement unless he wore a beard.... Furthermore, we find that the Examiner erred in holding that PFB is 'caused' by shaving—it is the disease of PFB that causes [Mr. Boyd's] disfigured face—not the act of shaving." The guidelines interpreting the Maryland discrimination laws define a handicapped individual as one who:

> a. Has a physical, mental, or emotional handicap as defined above; and whose condition is demonstrable by medically accepted clinical or laboratory diagnostic techniques, and which constitutes or is regarded as constituting a substantial limitation on one or more of a person's major life activities. Major life activities may be considered to include, but are not limited to, employment, transportation, adapting to housing, communication, self care, recreation, socialization, education, and vocational training.

COMAR 14.03.02.03 (1979). The Commission found the testimony of Mr. Boyd and his wife sufficient to conclude that the PFB condition significantly impaired Mr. Boyd's ability to socialize. The Commission referred to the hearing examiner's provisional order that Mr. Boyd's "reaction to the condition of his face after shaving adversely affected his social life causing him to forego going out in public because of his concern and embarrassment about his face." Specifically, Mr. Boyd testified that, when he shaved and PFB disfigured his face, "I wouldn't go anywhere because I was just embarrassed to be seen in public. I had to go to work in order to make a living. But that's all I would do was go to work and come home." He also testified that the condition affected his relationship with his wife because, "I was ashamed of how I looked and I did not want to be seen in public looking like that." Mrs. Boyd testified that the couple's social life was impaired during the periods when Mr. Boyd shaved and suffered from the symptoms of PFB.

The Court of Appeals of Michigan decided in *Shelby Township Fire Department v. Shields*, 115 Mich.App. 98, 320 N.W.2d 306 (1982), that a fireman afflicted with PFB

was handicapped within the meaning of Michigan's Handicappers' Civil Rights Act, which is similar to Maryland's discrimination laws. The Act, M.C.L. Section 37.1103(b); M.S.A. Section 3.550(103), defined 'handicap' as

a determinable physical or mental characteristic of an individual or the history of the characteristic which may result from disease, injury, congenital condition of birth, or functional disorder which characteristic:

(i) for purposes of article 2, is unrelated to the individual's ability to perform the duties of a particular job or position, or is unrelated to the individual's qualifications for employment or promotion.

In *Mass Transit v. Comm'n on Human Relations*, 68 Md.App. 703, 711, 515 A.2d 781 (1986), we held that the medical condition of hypertension *"could"* be a handicap." In *Mass Transit*, we followed the reasoning of the California court in *American National Insurance Company v. Fair Employment and Housing Commission*, 32 Cal.3d 603, 186 Cal.Rptr. 345, 651 P.2d 1151 (1982), and decided that the severity of a person's hypertension determined whether they would be classified as handicapped. We stated, "It would be imprudent for this court to determine that high blood pressure is always or could never be a handicap." *Mass Transit*, 68 Md.App. at 711, 515 A.2d 781. We believe that the Commission was correct in reversing the decision of the hearing examiner. There is substantial evidence to prove that the severity of Mr. Boyd's PFB condition significantly impairs his ability to socialize, considered to be a major life activity, and, therefore, is physically handicapping to him.

## IV.

■ Last, the University argues that the hearing examiner's award of $22,591 in backpay to Mr. Boyd was without proof. Under Art. 49B, § 11(e), the hearing examiner may provide for backpay and "order any other equitable relief that is deemed appropriate." The hearing examiner calculated Mr. Boyd's base backpay from evidence that his salary

was $19,235.14 in May of 1983 and that his salary would have increased to $20,390.00 by July of 1984. The total base backpay calculated by the hearing examiner was $39,470.00, and the hearing examiner reduced this figure by a factor of twenty-five per cent to reflect Mr. Boyd's "failure to seek out all potential employment." The hearing examiner, in reducing the award, considered the fact that Mr. Boyd did not fully mitigate his damages by seeking employment in other police positions available in local areas. The hearing examiner stated that he also considered the fact that Mr. Boyd had not completely removed himself from the workforce.

The University avers that the hearing examiner erred in his calculation because proper evidence was not submitted as to the salary Mr. Boyd would have earned in 1984 if he had remained as an officer at the University's Baltimore campus. Corporal Karl E. Shallhorn of the University of Maryland, College Park Police Department testified that Mr. Boyd's salary in July of 1984 would have increased to $20,390. Although Corporal Shallhorn testified to the salary of a College Park officer in a position similar to Mr. Boyd's, there was no difference in salary between the two campuses. We believe that the Commission's award of $22,591 in backpay is sufficiently supported by evidence in the record.

JUDGEMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.