652 A.2d 1183

**DEPARTMENT OF HUMAN RESOURCES**

v.

**Shirley THOMPSON.**

**No. 489, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Feb. 3, 1995.

Cathy A. Dryden, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Brian S. Brown (D'Alesandro, Milliman & Yerman, on the brief), Baltimore, for appellee.

Argued before MOYLAN, FISCHER and HOLLANDER, JJ.

HOLLANDER, Judge.

The Child Care Administration of the Department of Human Resources ("CCA"), appellant, denied the application for a family day care registration submitted by Shirley Thompson, appellee. CCA's decision was predicated on an administrative investigation of child abuse conducted by the Department of Social Services ("DSS") and a finding by DSS that appellee's husband had abused the couple's daughter. We now confront the issue of a litigant's right to challenge, at a day care registration hearing, a prior administrative finding of child abuse when no quasi-judicial or judicial tribunal ever determined that the abuse actually occurred and the litigant never had an opportunity to contest the administrative finding.

Ms. Thompson appealed CCA's denial of the day care registration to the Office of Administrative Hearings ("OAH"), and the Administrative Law Judge ("ALJ") affirmed CCA's decision. Thereafter, Ms. Thompson appealed the ALJ's decision to the Circuit Court for Baltimore County. That court reversed the ALJ's decision and remanded the case for a new hearing. This appeal followed.

CCA presents three questions for our review:

"I. Whether the Circuit Court erred in holding that, pursuant to COMAR 07.04.03.01B, the Secretary of Human Resources had delegated her authority to make licensing decisions to the Office of Administrative Hearings rather than delegating her authority to review those decisions."

"II. Whether the Circuit Court erred in remanding the case to the Office of Administrative Hearings to take additional evidence that was not presented to the agency when it made its decision."

"III. Whether the issue of whether the [child] abuse occurred was properly before the Administrative Law Judge."

We answer the first two questions in the negative and the remaining question in the affirmative. For the reasons we discuss below, we hold that, under the particular circumstances of this case, Ms. Thompson was entitled to contest the earlier administrative finding of abuse at her day care registration hearing. Further, we conclude that the decision of the ALJ was erroneous, arbitrary, and capricious and prejudiced substantial rights of appellee. Accordingly, we shall affirm the decision of the circuit court.

### Factual Summary

On April 9, 1992, Ms. Thompson filed an application with CCA for a family day care registration. As required, her application listed other members of her household, including her husband, Henry Thompson. In response to the application's question "[h]ave you or any other persons living in the family day care home been reported for child abuse or neglect?" Ms. Thompson responded "No." Ms. Thompson then signed and dated the authorization permitting CCA access to child abuse records in order to evaluate her suitability as a day care provider.

In the course of processing Ms. Thompson's application, CCA received from Baltimore County DSS a Child Protective Services ("CPS") clearance advising that DSS had a 1986 closed protective services case involving the Thompsons. Patricia Perry, a CCA licensing agent, discussed the DSS response with the Thompsons, and told them that CCA needed more information in order to proceed with the application process. Perry's investigation revealed that Mr. Thompson was identified as the "person ... responsible for child abuse or neglect" of the Thompsons' then teenage daughter.

Ms. Thompson signed additional consent forms to permit DSS to release additional information from the CPS file to CCA. DSS provided CCA with two reports detailing the allegations of abuse. One report described an incident that occurred on March 25, 1985 when the principal of Owings Mills Senior High School referred a matter of suspected sexual abuse to DSS. According to that report, the school nurse intercepted a note written to Laura Thompson. "The gist of the notes was encouraging Laura Thompson to seek help from a counselor due to the problems with her father, that is, sex abuse." The school was also concerned because Laura had suffered a broken collar bone one and one-half months before. DSS coordinated an investigation with a detective from the Youth Bureau, and they interviewed Laura Thompson, Laura Thompson's grandfather, Ms. Thompson, and Mr. Thompson. Although Mr. Thompson strenuously denied all allegations of child abuse, DSS concluded that the abuse was indicated. Nevertheless, the juvenile court never adjudicated the Thompson's daughter as a Child In Need of Assistance ("CINA"). Further, neither of the Thompsons' two children was ever removed from the Thompsons' home. Additionally, Mr. Thompson was never criminally charged or prosecuted.

In addition to gathering and evaluating the reports, Perry spoke with Mark Vidor, the Division Supervisor of CPS; Perry's supervisor spoke with Toni Greenberg, the continuing protective services worker at the time of the alleged child abuse. Perry also visited the Thompson home and interviewed Mr. Thompson on several occasions.

On June 26, 1992, following its investigation and subsequent evaluation, CCA issued a letter denying Ms. Thompson's application, based on COMAR 07.04.01.08A(9). That regulation provides that CCA may deny a certificate of registration if "an evaluation of the information provided in records of child abuse and neglect reveals that the applicant ... or a resident is identified as responsible for child abuse or neglect, or is currently under investigation for alleged acts of child abuse or neglect." The denial explained that CCA's decision

was "consistent with the State's mandate to protect the child and to resolve all doubts in favor of the child." Ms. Thompson appealed the denial on July 15, 1992.

Perry later received a letter from Laura Thompson Morrison, the Thompson's daughter who was the alleged victim of abuse. The letter, received on July 29, 1992, supported Ms. Thompson's application for a family day care registration. Morrison stated:

> I am writing this letter so that my mom, Shirley Yvonne Thompson can obtain her babysitting license to babysit in her home. It has come to my attention that the reason for this letter has to do with what happened eight (8) years ago.
>
> I intentionally told that my father had sexually and physically abused me. My father and I don't have the best of relationship, but I was willing to do anything to get attention from him.
>
> My dad worked alot and when he got home in time for dinner, he was tired. So every time I got into trouble, I at least got some attention from him. . . .
>
> I'm sorry if my childhood antics have caused any problems. I do hope this letter helps my mom obtain her license and in no way should reflect on the love and care she can give to any children that are placed in her home 'and care.

Perry discussed the letter with Vidor, and after further review, CCA affirmed its denial of Ms. Thompson's application.

Thereafter, on August 26, 1992, OAH heard Ms. Thompson's appeal. At the hearing, CCA presented testimony and exhibits regarding its evaluation of the CPS record and the CPS investigation that resulted in the DSS finding of "abuse indicated." Ms. Thompson and her husband testified in support of appellee's case. Morrison, however, was in Oklahoma, and Ms. Thompson offered Morrison's testimony via telephone because she could not afford to fly Morrison to Maryland. CCA objected to the telephone testimony, and the ALJ denied appellee's request to present her daughter's testimony by telephone, stating:

[T]he determination to be made by this forum is whether the agency correctly applied State regulations in reaching its decision. That determination is limited to an examination of the basis for the agency's decision to deny the application. Counsel, however, is challenging the actual findings and requests that this forum reinvestigate the allegations and make a determination of whether abuse actually occurred. Such a finding is beyond the scope of this proceeding and it is for this reason that the request for presentation of telephonic testimony was denied.

On September 10, 1992, OAH upheld CCA's denial of Ms. Thompson's application. Ms. Thompson appealed to the circuit court, and on November 24, 1993, that court heard argument. On February 4, 1994, the circuit court reversed OAH and remanded the case for a new hearing.

## Discussion

### I. The Day Care Regulatory Scheme

Family day care registrations are governed by Md.Code Ann., Family Law Art. ("F.L.") §§ 5–550 through 5–557 (1991 Repl.Vol.) and regulations found at COMAR 07.04.01 *et seq.* The statutory scheme is designed, *inter alia,* to safeguard children in day care homes. F.L. § 5–550(b)(1). To that end, "a provider may not operate a family day care home unless both the provider and the home have met the requirements for registration as set forth in [COMAR 07.04.01] and the provider possesses a valid certificate of registration." COMAR 07.04.01.03.

In order to obtain a family day care registration, an applicant must identify all residents in the home and submit a "signed and notarized permission to examine records of child abuse and neglect for information about the applicant ... and residents." COMAR 07.04.01.04. After receiving the application and accompanying documentation, CCA must then determine whether the applicant has complied with the requirements of CCA's regulations by:

(1) Evaluating the application and required documentation;

(2) Interviewing the applicant;

(3) Inspecting the home proposed for use as a family day care home;

(4) Evaluating the information provided by State and federal criminal background investigations; and

(5) Evaluating the information provided from records of child abuse and neglect.

COMAR 07.04.01.06A.

Based on its investigation, CCA may either grant or deny the registration certificate. In the case *sub judice*, CCA denied Ms. Thompson's registration based on COMAR 07.04.01.08A(9), which provides:

A. The Office may deny a certificate of registration if:

(9) An evaluation of the information provided in records of child abuse and neglect reveals that the applicant, any substitute designated on the application form, or a resident is identified as responsible for child abuse or neglect, or is currently under investigation for alleged acts of child abuse or neglect.

The family day care registration scheme provides for an administrative, adjudicatory hearing when CCA denies issuance of a requested license. *See Weiner v. Md. Insur. Admin.*, 337 Md. 181, 652 A.2d 125, 127 (1995) ("It is well settled that a party is entitled to a quasi-judicial hearing before an administrative agency ... if that type of hearing is required by statute or regulation or mandated by constitutional due process concerns."); *Sugarloaf Citz. Ass'n v. N.E. Md. Waste Disposal Auth.*, 323 Md. 641, 652, 594 A.2d 1115 (1991). Accordingly, pursuant to COMAR 07.04.03.03A, Ms. Thompson appealed CCA's denial of the day care registration to OAH. COMAR provides: "A hearing shall be held when an applicant or provider requests a hearing to contest ... [t]he denial of an applicant for registration."

When Ms. Thompson appealed, the ALJ was required to hold a "contested case" hearing, pursuant to the Adminis-

trative Procedure Act, Md.Code Ann., State Gov't Art. ("S.G.") §§ 10–201 through 10–225 (1993 Repl.Vol., 1994 Cum.Supp.).[1] Section 10–202(d)(1) of the State Government Article defines a contested case as follows:

> (c) *Contested case.*—"Contested case" means a proceeding before an agency to determine:
>
> > (1) a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing; or
> >
> > (2) the grant, denial, renewal, revocation, suspension, or amendment of a license that is required by statute or constitution to be determined only after an opportunity for an agency hearing.[2]

■ As the OAH proceeding constituted a "contested case" hearing, the parties were entitled to an adversary hearing, with various trial-like procedures and safeguards. *Sugarloaf,* 323 Md. at 651, 594 A.2d 1115; S.G. § 10–213 (1993 Repl.Vol., 1994 Cum.Supp.).[3] Specifically, COMAR 07.04.03.07B provides:

> B. At the hearing, the appellant and a representative of the Office may present witnesses, documentary evidence, and oral argument and may cross-examine any witness. A document introduced into evidence by a party may be examined by the opposing party.

After the OAH hearing, the ALJ is empowered to make the agency's final decision. Moreover, the ALJ decision is directly appealable to the circuit court. COMAR 07.04.03.01 states:

---

1. In 1993, S.G. §§ 10–201 through 10–217 (1984, 1990 Cum.Supp.) were recodified at §§ 10–201 through 10–225.

2. In 1993, S.G. § 10–201(c) was recodified as S.G. § 10–202(d)(1) (1993 Repl.Vol., 1994 Cum.Supp.). The 1993 amendment substitutes the words "by statute or constitution" for "by law."

3. S.G. § 10–208 (1984, 1990 Cum.Supp.) was recodified in 1993 as S.G. § 10–213.

A. This chapter applies to hearings concerning actions taken by the Child Care Administration which adversely impact on family day care registrations, such as registration denials, revocations, suspensions, reductions in capacity, or limitations on the ages or numbers of children who may be admitted to a family day care home.

B. The Secretary of Human Resources has delegated authority to the administrative law judges of the Office of Administrative Hearings to make the final decisions of the Secretary on those actions listed in § A, above. A decision by the administrative law judge of the Office of Administrative Hearings in a family day care registration case is the final decision of the highest administrative authority in the case and this is directly appealable to the circuit court in the jurisdiction where the family day care home is located, pursuant to State Government Article, [§ 10–222], Annotated Code of Maryland.

In making the final decision, the ALJ is required to consider the entire record of the hearing. Further, the ALJ must decide whether CCA complied with applicable state regulations. In pertinent part, COMAR 07.04.03.08 provides:

A. The administrative law judge **shall:**

(1) Base the decision on the **complete record;** and

(2) Determine whether the Office correctly applied State regulations in effect at the time it reached its decision.

(Emphasis added).

## II. Judicial Review of the ALJ Decision

An administrative decision in a contested case is subject to challenge through judicial review. S.G. § 10–222 (1993 Repl. Vol., 1994 Cum.Supp.).[4] Pursuant to COMAR, Ms. Thompson appealed the ALJ's decision directly to the circuit court; no other agency action occurred after the OAH hearing. *Compare, e.g., Anderson v. Dep't of Public Safety,* 330 Md. 187, 193–94, 623 A.2d 198 (1993) *and Dep't of Health & Mental*

---

4. In 1993, S.G. § 10–215 was recodified as § 10–222.

*Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994) (review of ALJ decision by agency Board or Secretary constituted final agency action) *with* the case *sub judice.* S.G. § 10–205 (1993 Repl.Vol., 1994 Cum.Supp.)[5] provides:

> (1) An agency or an official or employee of an agency may delegate to the Office of Administrative Hearings the authority that the agency, official, or employee has to hear particular contested cases.

> (2) An agency, by regulation, may delegate to the Office of Administrative Hearings the authority to issue the final administrative decision of the agency in a contested case.

*See Anderson,* 330 Md. at 192, 623 A.2d 198.

In the instant case, OAH conducted an evidentiary hearing at which witnesses testified and exhibits were presented. After the evidentiary hearing, the ALJ made findings of fact and conclusions of law. The ALJ's decision constituted the *final* order of the administrative agency and we shall apply the well established principles of judicial review to the ALJ decision.

▮ Our role in reviewing an administrative decision "is precisely the same as that of the circuit court." *Shrieves,* 100 Md.App. at 303–04, 641 A.2d 899 (citing *Baltimore Lutheran High Sch. Ass'n, Inc. v. Emp't Security Admin.,* 302 Md. 649, 662, 490 A.2d 701 (1985)); *see also, Anderson,* 330 Md. at 212, 623 A.2d 198. This means we must review the administrative decision itself. *Pub. Svce. Comm'n v. Baltimore Gas & Elec. Co.,* 273 Md. 357, 362, 329 A.2d 691 (1974); *State Election Bd. v. Billhimer,* 72 Md.App. 578, 586, 531 A.2d 1298 (1987), *rev'd on other grounds,* 314 Md. 46, 548 A.2d 819, *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1988); *see also Dep't Econ. & Emp't Dev't v. Hager,* 96 Md.App. 362, 625 A.2d 342 (1993).

---

5. S.G. § 10–207 (1984, 1992 Cum.Supp.) was recodified in 1993 as S.G. § 10–205.

■■■ Although a reviewing court may only affirm an administrative agency's decision on the same grounds found by the agency, *United Steelworkers of America v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62 (1984) (citing cases), the decision of an agency is *prima facie* correct. On appeal, the agency decision must be viewed in the light most favorable to the agency. *Bd. of Educ. v. Paynter*, 303 Md. 22, 35–36, 491 A.2d 1186 (1985). *See also, Md. State Police v. Lindsey*, 318 Md. 325, 333, 568 A.2d 29 (1990) (agency decision is presumptively correct and test is whether there is substantial evidence to conclude that a reasoning mind reasonably could have reached the factual conclusion the agency reached); *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 511–13, 390 A.2d 1119 (1978).

■■■ It is well settled that "the reviewing court should not substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken." *Paynter*, 303 Md. at 35, 491 A.2d 1186 (emphasis in original). *See also, Dep't of Health & Mental Hygiene v. Reeders Mem'l Home, Inc.*, 86 Md.App. 447, 452, 586 A.2d 1295 (1991); *Howard County v. Davidsonville Civic & Potomac River Ass'ns, Inc.*, 72 Md.App. 19, 34–35, 527 A.2d 772, *cert. denied*, 311 Md. 286, 533 A.2d 1308 (1987). Deference to the agency's findings is based upon the recognition of the agency's expertise.

> Upon appellate review, courts bestow special favor on an agency's interpretation of its own regulation. Recognizing an agency's superior ability to understand its own rules and regulations, a "court should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken."

*Reeders*, 86 Md.App. at 453, 586 A.2d 1295 (quoting *Bulluck*, 283 Md. at 513, 390 A.2d 1119). *See also, Hanson v. D.C. Rental Housing Comm'n*, 584 A.2d 592, 595 (D.C.App.1991) (Court of Appeals must defer to an agency's interpretation of its own regulations where that interpretation is reasonable); Kenneth Culp Davis & Richard J. Pierce, Jr., 1 *Administra-*

*tive Law Treatise,* § 6.10 at 282 (3d ed. 1994) (courts defer to agency interpretation of regulations because the agency typically is in a superior position to determine what it intended when it issued a rule).

S.G. § 10–222(h) governs the standard of judicial review in connection with administrative adjudications. Section 10–222(h) provides:

In a judicial proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

*See also, Md. State Police v. Lindsey,* 318 Md. 325, 332–34, 568 A.2d 29 (1990); *State Election Bd. v. Billhimer,* 314 Md. 46, 548 A.2d 819 (1988).

 To the extent the issues on appeal turn on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test. *Billhimer,* 314 Md. at 58–59, 548 A.2d 819 (1988). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Supervisor of Assessments v. Group Health Ass'n, Inc.,* 308 Md. 151, 159, 517 A.2d 1076 (1986) (quoting *Bulluck,* 283 Md. at 512, 390 A.2d 1119). *See also, Dashiell v. Dep't of Health & Mental Hygiene,* 327 Md. 130, 137, 607 A.2d 1249 (1992). In contrast to factual challenges, the substituted judgment standard is used with respect to a claim that the agency erred as a matter of law.

*Reeders,* 86 Md.App. at 452, 586 A.2d 1295. *See also, Perini Services, Inc. v. Health Resources Planning Comm'n,* 67 Md.App. 189, 201, 506 A.2d 1207, *cert. denied,* 307 Md. 261, 513 A.2d 314 (1986). A challenge as to a regulatory interpretation is, of course, a legal issue. *Id.* ("The substituted judgment test is the analysis employed when we interpret the requirements of ... COMAR.")

In *Caucus Distributors, Inc. v. Md. Securities Comm'r,* 320 Md. 313, 577 A.2d 783 (1990), the Court described the review process under § 10–215(g), the predecessor to § 10–222(h), as follows:

> In determining whether an agency's decision is supported by substantial evidence, we are mindful that substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In applying the substantial evidence test, we must not substitute our judgment for the expertise of the agency, for the test is a deferential one, requiring "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions." This deference applies not only to agency fact-finding, but to the drawing of inferences from the facts as well. When, however, the agency's decision is predicated solely on an error of law, no deference is appropriate and the reviewing court may substitute its judgment for that of the agency.

*Id.,* at 323–24, 577 A.2d 783 (citations omitted).

 In sum, modification or reversal of the agency's decision is only appropriate when the petitioner has demonstrated that substantial rights of the petitioner have been prejudiced by one or more of the causes specified in § 10–222(h). *Bernstein v. Real Estate Comm'n,* 221 Md. 221, 230, 156 A.2d 657 (1959), *appeal dismissed,* 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960).

### III. Whether Child Abuse Occurred Was A Matter For ALJ's Determination

The ALJ concluded that the issue of whether Mr. Thompson abused his daughter was beyond the scope of the day care

licensing hearing. Appellee claims that when a day care license is at stake, the applicant is entitled to challenge a prior DSS finding of "abuse indicated" if the prior administrative finding is the basis for denial of the license. Appellant claims, on the other hand, that an applicant is only entitled to challenge whether DSS correctly followed CPS regulations.[6]

Circuit Court Judge James T. Smith opined that "the ALJ's conclusion of law that the CCA '. . . properly and correctly applied the applicable regulation, COMAR 07.04.01.08A, in reaching its decision to deny [Ms. Thompson's] application' . . . is supported by the record below." In a sound and well-reasoned opinion, Judge Smith further held that the ALJ "failed to recognize [her] ultimate responsibility, and thereby . . . erred as a matter of law." Accordingly, he reversed and remanded for a new hearing, in order to allow Ms. Thompson to present testimony from the alleged abuse victim. Judge Smith said:

> Although determining whether the CCA correctly applied State regulations was a subject for [the ALJ's] review and consideration, the ALJ also was required to make the ultimate decision, namely, whether the applicant should be granted or denied her registration pursuant to COMAR 07.04.01.08A based on the factors set forth in COMAR 07.04.01.06A.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> The ALJ's failure to realize her responsibility to independently consider the merits of the case before her and to base her decision on the complete record, seems to have affected her decision when she was requested to receive testimony from the alleged abuse victim.

---

6. Appellant notes that in an administrative licensing hearing, COMAR 07.02.02.08B affords an applicant the opportunity to challenge whether DSS correctly applied CPS regulations in determining that abuse occurred, so long as the CPS investigation was a basis for the decision. Appellant asserts, however, that appellee has not claimed that DSS failed to follow its regulations in making its determination that abuse had occurred.

Appellee has offered scant authority to support her assertion that the ALJ should have considered the merits of the abuse issue. In resolving the question of whether the underlying issue of abuse was a matter for the ALJ's consideration, we find it significant that the DSS abuse investigation was not an adversarial proceeding and no quasi-judicial or judicial tribunal ever reviewed that agency's determination of child abuse. In the absence of any legal determination of actual child abuse, and where the alleged abuser was not afforded any forum to challenge the DSS contention or finding, we hold that the DSS determination of child abuse cannot preclude a potential day care licensee from challenging the merits of the agency's abuse finding in a subsequent licensing proceeding. Accordingly, the ALJ erred when she determined that the issue of whether the child abuse occurred was not properly before her; the ALJ should have considered admissible evidence offered by appellee with respect to her claim that the child abuse did not occur. We explain.

DSS is responsible for investigating reports of suspected abuse. F.L. § 5–706 requires, for example, that within 24 hours after receiving a report of physical or sexual abuse, the local DSS department shall make a thorough investigation of a report of suspected child abuse and, if the abuse is verified, DSS shall make a determination of the identity of the person responsible for the abuse. *See* COMAR 07.02.07.

According to COMAR 07.02.07.07, DSS is authorized to determine, based on its own investigation, whether a report of suspected child abuse is found to be "indicated" or "unsubstantiated." "An 'indicated' report of child abuse means one in which there is credible and specific evidence, which has not been satisfactorily refuted." COMAR 07.02.07.08B(1). The determination that abuse is indicated, however, "does not require a court conviction for the crime of child abuse or the existence of proof sufficient to obtain such a conviction." COMAR 07.02.07.08B(2).

Here, as we have observed, DSS investigated the allegation of child abuse and ultimately implicated Mr. Thompson.

Clearly, the administrative investigation was not adversarial in nature. *See* 2 Am Jur.2d *Administrative Law*, § 140, 160 (1994). Although Mr. Thompson strenuously denied the allegation, we have not been made aware of any procedural rights provided to him to controvert or litigate the DSS finding of "abuse indicated." Nor have we found any such provisions available to him at the relevant time. Moreover, DSS chose not to pursue the matter in juvenile court or to refer the matter for criminal prosecution. Accordingly, the DSS investigation did not result in a final determination of guilt or an adjudication that the child was a CINA based on the abuse. Consequently, the agency's internal investigation cannot have preclusive effect in a subsequent proceeding.

The doctrines of res judicata and collateral estoppel do not advance appellant's position.[7] These doctrines are based on "the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria Federal S & L v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). What the Court said in *Univ. of Md. v. Boyd*, 93 Md.App. 303, 612 A.2d 305 (1992), is also pertinent here: "*Res judicata* generally precludes 'the relitigation of matters that have been fully and fairly litigated and finally decided between the parties, by a tribunal of competent jurisdiction.'" *Id.* at 308, 612 A.2d 305 (quoting *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547, 555 A.2d 502 (1989)).

---

7. In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979), the Supreme Court distinguished the doctrine of res judicata from the doctrine of collateral estoppel. It stated:

> Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

In *U.S. v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), the Supreme Court explained the circumstances under which an agency's action may bar subsequent litigation:

When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.

*See also, North Carolina v. Chas. Pfizer & Co., Inc.*, 537 F.2d 67, 73 (4th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976) (manufacturer not collaterally estopped because prior FTC proceeding did not afford a " 'fair opportunity procedurally, substantively and evidentially' to litigate the issue raised in the present case.").

Similarly, in *Batson v. Shiflett*, 325 Md. 684, 602 A.2d 1191 (1992), the Court expressed Maryland's test for determining when an agency decision is entitled to preclusive effect.[8]

---

8. According to the *Restatement (Second) of Judgments* § 83(2) (1982), the following elements must be present for the decision of an administrative agency to have res judicata effect:

An adjudicative determination by an administrative tribunal is conclusive under the rules of res judicata only insofar as the proceeding resulting in the determination entailed the essential elements of adjudication, including:
(a) Adequate notice to persons who are to be bound by the adjudication . . .;
(b) The right on behalf of a party to present evidence and legal argument in support of the party's contentions and fair opportunity to rebut evidence and argument by opposing parties;
(c) A formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status, or a specific series thereof;
(d) A rule of finality, specifying a point in the proceeding when presentations are terminated and a final decision is rendered; and
(e) Such other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, having regard for the magnitude and complexity of the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain evidence and formulate legal contentions.

"Whether an administrative agency's declaration should be given preclusive effect hinges on three factors: '(1) whether the [agency] was acting in a judicial capacity; (2) whether the issue presented to the district court was actually litigated before the [agency]; and (3) whether its resolution was necessary to the [agency's] decision.'"

*Id.* at 701, 602 A.2d 1191 (quoting *Batson v. Shiflett*, 86 Md.App. 340, 356, 586 A.2d 792 (1991)).

In *Powell v. Md. Aviation Admin.*, 336 Md. 210, 647 A.2d 437 (1994), the Court of Appeals recently confronted an issue of preclusion that is instructive here. In *Powell*, the Court considered whether a guilty finding, followed by probation before judgment, could be given preclusive effect in a subsequent administrative disciplinary proceeding. Mr. Powell, a Maryland Aviation Administration employee, was charged and found guilty in the circuit court of telephone misuse. At sentencing, the conviction was set aside and he received probation before judgment. Administrative disciplinary charges were also filed. At the administrative hearing, the ALJ held that "[f]or purposes of this administrative hearing, the Circuit Court judge's finding of guilty after a court trial where Mr. Powell was represented by counsel is sufficient to support a violation of COMAR...." *Id.* at 216, 647 A.2d 437. The Court of Appeals disagreed. It held that the circuit court's finding of guilt did not result in a judgment of conviction. "Because there [was] no judgment, the principle called nonmutual collateral estoppel or issue preclusion does not apply to bar relitigating the facts underlying the finding." *Id.* at 218, 647 A.2d 437. *See also, Mannan v. D.C. Bd. of Medicine*, 558 A.2d 329, 336–40 (D.C.App.1989). Accordingly, the Court concluded that probation before judgment based on a finding of guilt could be used as evidence of misconduct in an administrative hearing, but it could not be given conclusive effect.

We apply the foregoing principles here. DSS clearly was not acting in a quasi-judicial or judicial capacity when it made a finding of "abuse indicated." Neither appellee nor her husband ever had an opportunity to litigate the finding of

abuse. Nor was there a final judgment relating to the alleged child abuse. As Mr. Thompson was never afforded an opportunity to contest the accusation of abuse, the agency's investigatory finding cannot be given preclusive effect in a subsequent challenge to that finding. To the extent the ALJ refused to allow Ms. Thompson to contest the abuse finding, the ALJ erred.

The ALJ's decision to preclude consideration of appellee's challenge to the DSS finding infringed Ms. Thompson's right to a meaningful hearing. *See Md. State Police v. Zeigler,* 330 Md. 540, 559, 625 A.2d 914 (1993) ("Procedural due process, guaranteed to persons in this State by Article 24 of the Maryland Declaration of Rights, requires that administrative agencies performing adjudicatory or quasi-judicial functions observe the basic principles of fairness as to parties appearing before them."). *See also,* 2 Am Jur.2d *Administrative Law* § 140 at 161 ("As long as no legal rights are adversely determined during the investigation, the demands of due process are satisfied if procedural rights are granted in the subsequent proceedings."). To deny Ms. Thompson the right to contest the underlying administrative finding when that finding affects Ms. Thompson's right to pursue a livelihood seems particularly unfair. Fundamental liberty interests protected by the due process clause of the constitution include

> "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men [and women]."

*Bd. of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972) (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)).

Legislation that post-dated the DSS finding in 1986 of "abuse indicated" as to Mr. Thompson adds further support to

our conclusion. Statutory enactments in 1987 and 1993 provide fundamental protections to persons who, like Mr. Thompson, are accused by DSS of abuse.

F.L. § 5–715 was adopted in 1987; it protects, *inter alia,* persons *suspected* of abuse or neglect. The statute requires that, before the name of a *suspected* abuser can be entered in the Child Abuse Central Registry, he or she must be given notice and an opportunity to contest the entry at an administrative hearing.[9] *See also,* COMAR 07.02.02.03.

In 1993, the Legislature enacted F.L. § 5–706.1; it also furnishes important protections to one accused of abuse. This section provides, in pertinent part, as follows:

(a) *Notice of finding and right to appeal after investigation.*—Within 30 days after the completion of an investigation in which there has been a finding of indicated or unsubstantiated abuse or neglect, the local department [of social services] shall notify in writing the person alleged to have abused or neglected a child:

(1) of the finding; and

(2) except when a CINA petition has been filed involving the child alleged to be abused or neglected, that the person may request an administrative hearing to appeal the finding.

(b) *Notice of right to appeal after dismissal of petition.*—Within 30 days of a dismissal of a CINA petition, the local department of social services shall notify in writing the person alleged to have abused or neglected a child that the person may request an administrative hearing to appeal an indicated or unsubstantiated finding.

(g) *[Hearing]—Stay pending criminal charges.*—If a criminal proceeding is pending on charges arising out of the alleged abuse or neglect, the Office of Administrative Hearings shall stay the hearing until a final disposition is made.

---

**9.** In contrast, § 5–715(c)(3) permits entry into the central registry of anyone *adjudicated* an abuser.

(h) *Same—Dismissal following criminal conviction.*—If after final disposition of the criminal charge, the person requesting the hearing is found guilty of any criminal charge arising out of the alleged abuse or neglect, the Office of Administrative Hearings shall dismiss the administrative appeal.

We observe that none of these protections was in place when Mr. Thompson was investigated by DSS in 1986. The absence of these protections underscores Ms. Thompson's right to have had an opportunity to challenge the DSS finding of abuse at the family day care registration hearing conducted by the ALJ.

### IV. CCA's Scope of Responsibility

We emphasize that our holding should not be construed as expanding CCA's burden of proof at a contested licensing hearing. CCA is obligated to analyze and evaluate relevant information and records and, in a contested hearing, to present evidence relating to its evaluation. COMAR 07.04.06A. But CCA is not required to re-investigate, independently, an underlying finding of abuse by DSS. On the contrary, it may base its denial of a day care registration on its evaluation and appraisal of records of child abuse and other information it gathers.

As discussed earlier, COMAR 07.04.01.08A(9) provides:

"The Office [of Child Care Licensing and Regulation] may deny a Certificate of Registration if: ... an *evaluation of information provided in records* of child abuse and neglect reveals that the applicant, ... or a resident is identified as responsible for child abuse or neglect...." (Emphasis added).

Appellee argues that, pursuant to COMAR 07.04.01.06A, both CCA and the ALJ were required to evaluate the information provided from records of child abuse and neglect. Appellee contends, however, that the ALJ failed to *evaluate* the information provided in records of child abuse and neglect. She asserts that "the ALJ simply acted as a rubber stamp and

refused to consider any evidence presented on the issue of whether the child abuse occurred." Ms. Thompson claims that "[b]y using the term 'evaluation' the drafters of the regulation indicated their intention that the reviewing authority, be it the agency or the OAH delve deeper into any child abuse or neglect allegation than a simple acceptance of the findings of [DSS]."

We note that COMAR 07.04.01.08A(9) does not pertain to the ALJ. Rather, it applies only to CCA. Accordingly, appellee's reliance on this provision to impose an obligation on the ALJ to conduct another abuse investigation is misplaced.

Moreover, it is plainly apparent, as the ALJ necessarily concluded, that CCA complied here with its obligation to "evaluate" the information it gathered pursuant to COMAR. "When interpreting a statute, we assume that the words used have their ordinary and natural meaning." *Rettig v. State*, 334 Md. 419, 423, 639 A.2d 670 (1994). Therefore, we look first to the plain meaning of the words. *Condon v. Univ. of Md.*, 332 Md. 481, 491, 632 A.2d 753 (1993) ("We first look to the plain meaning of the language of the statute to discern legislative intent."). *Random House Webster's College Dictionary* defines the word "evaluation" as "an act or instance of evaluating or appraising." It further defines "evaluate": "to determine the significance or quality of; assess." *Random House Webster's College Dictionary* 462 (1991); *see also, Webster's II New Riverside University Dictionary* 447 (1984) (defining "evaluate:" "to examine carefully").

The plain meaning of the word "evaluation" warrants the conclusion that COMAR requires CCA to examine, consider, assess, and analyze the CPS records. But the word "evaluation" cannot logically be understood to require CCA to conduct an independent investigation of the original child abuse charges—events, we observe, from years past. Nor do CCA regulations authorize CCA to reverse a finding of child abuse made by DSS and reflected in CPS records. Indeed, appellee has not provided any authority to support such a claim.

## V. The Complete Record

█ The ALJ is obligated to ensure that the agency correctly applied the law and followed all relevant procedures. *See Zeitschel v. Bd. of Educ.*, 274 Md. 69, 83, 332 A.2d 906 (1975) (*quoting Snowden v. Baltimore*, 224 Md. 443, 448, 168 A.2d 390 (1961). But the regulations also mandate a thorough review by the ALJ of the "complete record." By evaluating the "complete record", determining whether CCA correctly employed the law, and deciding if CCA followed the applicable COMAR regulations, the ALJ makes the "final decision" for the agency.

The ALJ certainly considered the extent of the CCA investigation and its evaluation of CPS records. Based on CCA's presentation of information from the DSS records, the ALJ found:

1. In March 1985, the principal of Owings Mills Senior High School referred a matter of suspected child abuse involving Appellant's adopted daughter to the Baltimore County Department of Social Services.

2. Appellant's adopted daughter was 13 1/2 years old at the time of the referral.

3. The suspected abuser was Appellant's husband.

4. Upon investigation, the Child Protective Services worker classified the referral as "sexual abuse indicated."

5. On or about April 9, 1992, Appellant applied for a family day care registration with the Child Care Administration.

6. At the time of the application and at all times pertinent to this matter, Appellant and her husband resided in the same home.

7. A background check pursuant to Appellant's application uncovered the "sexual abuse indicated" finding involving Appellant's husband.

8. Appellant's application for family day care home registration was denied on the basis of the abuse indicated finding involving Appellant's husband.

■ But what is at issue here is the extent of the "complete record" that was subject to the ALJ's consideration. We hold that the ALJ's decision was not based on the "complete record," as required by COMAR, because the ALJ expressly refused to consider any evidence Ms. Thompson sought to present relevant to the merits of the child abuse allegation. In effect, the ALJ heard only one side of the contested case; she only considered the DSS record that CCA had reviewed when it determined to deny the registration. Ms. Thompson was not permitted to develop the record. Consequently, the ALJ's decision contravened COMAR 07.04.03.07, which specifically permits both CCA and Ms. Thompson to present evidence.

The ALJ's comment, *supra*, that she was only required to determine whether CCA correctly applied its regulations irrefutably establishes that she limited her review to an examination of the agency's basis for its action. As Judge Smith observed, the ALJ failed to recognize her responsibility to consider both sides of the case before her and to base her decision on the complete record. The ALJ's failure to consider Ms. Thompson's evidence was erroneous, arbitrary, and capricious.

### VI. Telephonic Testimony

■ Appellant also contends that the circuit court erred in remanding the case to OAH to take additional evidence that had not been presented to CCA. S.G. § 10–213 (1993 Repl. Vol., 1994 Cum.Supp.) [10] states that parties before the OAH are entitled to call and cross-examine witnesses, offer evidence, and present argument on genuine issues in a contested case.

Judge Smith did not quarrel with the ALJ's refusal to allow telephonic testimony from Morrison. Nor do we. Judge Smith concluded, however, that "on the basis of the ALJ's explanation of her denial, that a substantial right of the

---

**10.** S.G. § 10–208 was recodified in 1993 as S.G. § 10–213.

Petitioner may have been prejudiced.... Had she realized her decision went beyond merely reviewing the basis of the Agency's decision, the ALJ may have allowed an alternative opportunity for presentation of testimony from the alleged abuse victim, such as the granting of a continuance to allow the witness to appear in person."

We agree that the ALJ properly excluded Morrison's *telephone* testimony. At the administrative hearing, Ms. Thompson sought to introduce Morrison's telephone testimony and CCA objected.[11] According to COMAR 28.02.01.17(b)(1), which governs the use of telephonic testimony in administrative hearings, "[t]he judge may, *with consent of the parties,* conduct all or part of the hearing by telephone." (Emphasis added). *See also,* S.G. § 10–211 (1993 Repl.Vol., 1994 Cum. Supp.). Because the agency objected to the presentation of Morrison's testimony by telephone, the ALJ was without authority to admit it. On remand, however, if Ms. Morrison appears, or if there is no objection to her testimony by telephone, her testimony would not be inadmissible merely because it pertains to the question of the occurrence of the child abuse.

**JUDGMENT AFFIRMED; APPELLANT TO PAY COSTS.**

---

11. CCA made two objections: "One is the identity issue, as I have no way of ascertaining the person or the voice on the other end of the telephone as Laura Thompson [Morrison].... The second objection is frankly the issue of confrontation and meaningful opportunity to cross examine."