36 A.3d 483

Lisa MEADE

v.

**SHANGRI–LA PARTNERSHIP and a Business t/a & d/b/a Children's Manor Montessori School.**

No. 128, Sept. Term, 2008.

Court of Appeals of Maryland.

Jan. 26, 2012.

Laurence S. Kaye (The Kaye Law Firm of Gaithersburg, MD; Julie Glass Martin–Korb, Rockville, MD; and Michael J. Silverman of Law Office of Michael J. Silverman, P.A., Columbia, MD), all on brief, for petitioner.

Pamela Dement–Carpenter (Corbin, Schaffer & Aviles, Chtd., Severna Park, MD; Pradip K. Ghosh (pro se)), all on brief, for respondent.

C. Matthew Hill, Esq., Murnaghan Appellate Advocacy Fellow, Baltimore, MD, Jonathan C. Puth, Esq., Metropolitan Washington Employment Lawyers Association, Washington, D.C., for Amici Curiae brief of Public Justice Center, Metropolitan Washington Employment Lawyers Association, Maryland Disability Law Center, Maryland Employment Lawyers Association, Maryland Nurses Coalition, Inc., Civil Justice, Inc., and Maryland Nurses Association, for Petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, JOHN C. ELDRIDGE (Retired, Specially Assigned) and IRMA S. RAKER (Retired, Specially Assigned).

JOHN C. ELDRIDGE (Retired, Specially Assigned), J.

This is a civil action, authorized by a State statute and by the Howard County Code, in which the plaintiff seeks damages for a school's alleged discrimination because of the

plaintiff's handicap. We issued a writ of certiorari in the case to consider whether discrimination because of a "handicap," within the meaning of the Maryland statutory provisions, should be construed "strictly to create a demanding standard for qualifying as disabled,"[1] as certain federal cases had construed the term "disability" as used in the federal Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* We shall hold that the Court of Special Appeals erred in applying this standard to reverse the jury's verdict in this case. In our view, the jury was presented with sufficient evidence to determine that the petitioner was the victim of discrimination because of a handicap under the Maryland statutory provisions.

## I.

The evidence at trial disclosed the following facts. The petitioner, plaintiff Lisa Meade, was first diagnosed by her physician with an allergy to latex around 1997 or 1998. Her reactions to latex included: itchy skin, nose, and eyes; swelling of the eyes, lips and throat; sneezing; chest pain; shortness of breath and wheezing. Her physician warned her that continued exposure to latex products could cause her allergic reactions to intensify and, in extreme cases, such latex allergies could cause respiratory arrest. She was also cautioned that her allergy to latex had a cumulative effect. The greater her exposure to latex, the more sensitive she could potentially become, with her allergic reactions gradually manifesting more threatening symptoms. Secondary exposure to latex also posed a threat to Meade; she had allergic reactions when she interacted with something or someone who had previously come into contact with latex. Powdered latex gloves presented a particular danger to Meade, as latex particles can attach to the powder in the gloves. When individuals put the gloves on, the powder with the latex particles becomes airborne. A severe allergic reaction could occur if Meade inhaled the airborne latex particles.

---

1. *See, e.g., Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 691, 151 L.Ed.2d 615, 631 (2002).

After learning of her latex allergy and the potential consequences of latex exposure, Meade attempted to eliminate her exposure to latex in all areas of her life. She removed all latex products from her home. In her occupation as a physician's assistant, the office where she worked switched to non-latex gloves. Meade testified that her health dramatically improved once these changes had been made. Accidental exposures to latex, however, still continued to trigger allergic reactions. For example, while visiting her mother in a hospital where powdered latex gloves were used, Meade experienced shortness of breath, wheezing, and chest pain, forcing her to leave the hospital. During her son's visit to a dentist who used latex gloves, Meade had to leave the office because she began wheezing, her eyes became itchy and started swelling shut, and her lips also started to swell.

When she became aware in August or September of 1999 that teachers at her two-year old son's school, Children's Manor Montessori School, were using powdered latex gloves when changing diapers, she brought in boxes of non-latex vinyl gloves for the teachers to use on her son, and non-powdered latex gloves for them to use throughout the school. She also approached the school administrator, Dr. Pradip K. Ghosh, about her latex allergy. She explained her concern with powdered latex gloves and requested that the school change to powder-free gloves. According to Meade, Ghosh replied that he was not aware that the gloves were an issue, but that he would look into the situation. As a follow-up to her conversation with Ghosh, Meade requested that her physician write to Ghosh, explaining her allergy and the particular dangers posed by powdered latex gloves, and her doctor did so. An "occupational physician" whom Meade knew also spoke with Ghosh by telephone.

Shortly after the letter was sent, Meade spoke again with Ghosh, and he told her that the school would not make the changes which she had requested. Ghosh later testified that he had never directly refused her request, but he did acknowledge that the school did not change the gloves that they used because "we didn't want to change our supplier." Rather,

Ghosh attempted to accommodate Meade by directing his staff not to use latex gloves while changing her son and allowing Meade to pick up her son at the school's front desk so that she did not have to venture further into the school to collect her son.

Meade herself wrote Ghosh a letter which included "information regarding [her] latex allergy and [her] rights under the law." Meade's letter also stated:

"As you know, I have asked you ... to change your gloves to non-powdered latex for use on the other children so that I may enter your building safely. As my child is enrolled in your preschool, it is my right to enter the building, see his classroom, meet with his teachers, and attend functions sponsored by your facility. Please do not deny me the right to be part of my son's preschool experience."

Ghosh responded three days later in a letter to Meade which requested her to withdraw her son from the school, citing a clause in the school's contract which allowed the school to "ask any pupil to withdraw, at any time, for any reason the administration feels ... is sufficient." Ghosh's letter explained that he was asking Meade to withdraw her son because Ghosh was "not willing to expose [Children's Manor Montessori School] to potential litigation from [Meade]."

Meade subsequently filed a complaint with the Howard County Office of Human Rights in which she alleged that Ghosh and the school had discriminated against her on the basis of a handicap in violation of Maryland Code (1957, 2003 Repl.Vol.), Article 49B, § 42, and the Howard County Code.[2]

---

2. Article 49B, § 42, in effect when Meade's complaint was filed, provided, as follows:

"§ 42. Civil actions for discriminatory acts—Montgomery County, Prince George's County, and Howard County.

(a) *Authorized.*—In Montgomery County, Prince George's County, and Howard County, in accordance with this subtitle, a person who is subjected to an act of discrimination prohibited by the county code may bring and maintain a civil action against the person who committed the alleged discriminatory act for damages, injunctive relief, or other civil relief.

Meade claimed that her latex allergy constituted a "handicap" under the Howard County Code and that the school refused to make reasonable accommodations for her handicap when it refused to stop using the powdered latex gloves.[3] Meade alleged that the school's action violated § 12.210 II of the Howard County Code which prohibits discrimination in the provision of public accommodations.[4] She also alleged that the school had retaliated against her by asking her to withdraw her son from school when she asked for accommodations for her latex allergy.

----

(b) *Limitations periods.*—(1) An action under subsection (a) of this section shall be commenced in the circuit court for the county in which the alleged discrimination took place not later than 2 years after the occurrence of the alleged discriminatory act.

(2) Subject to the provisions of paragraph (1) of this subsection, an action under subsection (a) of this section alleging employment or public accommodation discrimination may not be commenced sooner than 45 days after the aggrieved person files a complaint with the county agency responsible for handling violations of the county discrimination laws.

(3) Subject to the provisions of paragraph (1) of this subsection, an action under subsection (a) of this section alleging real estate discrimination may be commenced at any time.

(c) *Fees and costs.*—In a civil action under this section, the court, in its discretion, may allow the prevailing party reasonable attorney's fees, expert witness fees, and costs."

This section was later recodified, without substantive change, in Maryland Code (1984, 2009 Repl.Vol.), § 20–1202 of the State Government Article.

3. Section 12.201 of the Howard County Code provides:

"**Sec. 12.201.—Definitions.**

Words and phrases used in this subtitle shall have their usual meaning except as defined below:

* * *

IX. *Handicap* means with respect to an individual:

(a) A physical or mental impairment which substantially limits one or more of the individual's major life activities; or

(b) A record of having such an impairment; or

(c) Being regarded as having such an impairment."

4. Section 12.210 II of the Howard County Code provides:

"*Unlawful practices* means it shall be unlawful if, because of discrimination, an owner or operator (or his/her agent) of public accommodations denies any person any of the accommodations, advantages, facilities or privileges of such public accommodations."

The Howard County Office of Human Rights investigated the charges made by Meade and issued "Written Findings of Reasonable Cause," in which it concluded that Meade had "established a prima facie case of disability accommodation discrimination. . . ." The Findings also agreed that "the termination of enrollment on the heels of [Meade's] letter which outlined a public accommodation's responsibilities . . . supports a finding of retaliation."

Former Article 49B, § 42(a), of the Maryland Code and § 12.217 II of the Howard County Code allow "[a]ny person . . . aggrieved by an act prohibited by this subtitle . . . [to] bring an action . . . in the Circuit Court for Howard County" for "damages, including counsel fees." Pursuant to those statutory provisions, Meade filed in the Circuit Court for Howard County a complaint for money damages and counsel fees against Children's Manor Montessori School.[5] In addition to her charges of discrimination, Meade also claimed that the school had unlawfully retaliated against her request for accommodations by requesting that she withdraw her son.

A three day trial was held on February 15, 16, and 17, 2006. Throughout her testimony, Meade highlighted the hazards posed to her by airborne latex particles. She feared that, at school,

"powder from the gloves would get on [her son's] clothing, on his body, and then that could be transferred to me when I would take over for him, take him home, change his clothes, be in contact with him, hug him, kiss him."

She testified that when she went to the school, she "spent very little time there" and went "in and out as quickly as possible." While there, she would "hold[ ] [her] breath, or tak[e] shallow breaths . . . to minimize [her] exposure."

Meade's testimony also included descriptions of how the school's use of powdered latex gloves affected her as a parent.

---

5. Meade's complaint was later amended to add Shangri-La Limited Partnership and Shangri-La Enterprises, Inc., the owner and general partner of the school, respectively.

She explained that she would have liked to have been more a part of her son's education, but felt that she could not because of the potential exposure to airborne latex. She testified that, when her older son had attended the same school several years earlier, prior to her allergy symptoms becoming severe, she would

"spend time in his classroom, speaking with the teacher, seeing the work he had been doing, the projects he'd completed. We would go to the library, look at some of the books. Sometimes I sat in on classes just to observe. He' was involved in the gymnastics program, and I would come observe that as well, his participation in gymnastics."

Meade testified that she could not do these things with her younger son "[b]ecause I didn't want to be around the latex glove exposure."

During the trial, counsel for the defendants contended that Meade's allergy to latex did not constitute a handicap under the Howard County Code's definition of the term. Defense counsel argued that the term "handicap" should be narrowly construed in accordance with several federal cases which had established a strict and demanding standard for the term "disability" as used in the federal Americans with Disabilities Act. After all the evidence had been submitted, but prior to the adjournment of the jury for deliberations, defense counsel moved for judgment, arguing that "[j]ust because she has an allergy is not a per se finding of disability." The trial judge reserved on the defense motion for judgment.

The jury subsequently returned a special verdict in favor of Meade. The jury specifically found that Meade had "a physical or mental impairment which substantially limit[ed] one or more of [her] major life activities," that Meade had been denied the accommodations of the school because of discrimination, and that the school had retaliated against her. The jury awarded Meade $1,683 in economic damages, $5,000 in non-economic damages, and $22,800 in attorney's fees.

The defendants subsequently moved for judgment notwithstanding the verdict, pursuant to Maryland Rule 2–532, but the trial court denied both the previously deferred motion for

judgment and the motion for judgment notwithstanding the verdict. The judge pointed out that he was bound to view the evidence and all reasonable inferences in the light most favorable to Meade, and that he would not disturb the jury's verdict "[i]f there is sufficient evidence on the record from which a jury could have reasonably reached this verdict."

With regard to the issue of whether a latex allergy could qualify as a handicap, the trial judge stated that Meade's "condition constitutes an impairment," falling within the definition of "handicap" in § 12.201 of the Howard County Code. The judge, however, found that there was "a qualitative difference" between the impact of Meade's latex allergy on her breathing and the more severe breathing impairments faced by litigants in the federal cases relied on by defense counsel. Nevertheless, the judge noted that the Howard County "Code expressly defines handicap as including the substantial limitation of one or more major life activities" and that "major life activities include more activities than just breathing." The trial judge cited *University of Maryland v. Boyd*, 93 Md.App. 303, 318, 612 A.2d 305, 313 (1992), a case in which the Court of Special Appeals held that a "condition [which] significantly impairs [a person's] ability to socialize, considered to be a major life activity, . . . is physically handicapping to him." While Meade had not, in the judge's view, produced enough evidence to uphold a jury's verdict on discrimination based upon her breathing difficulty, the judge decided that "sufficient evidence" had been adduced "to generate a jury question as it relates to [the] major life activity of socialization." The trial judge further noted that "there is authority to support the argument that parenting is a major life activity" and that Meade had demonstrated that her latex allergy had "affected the way that she interacts with her children . . . at school." Accordingly, the defendant's motion for judgment notwithstanding the verdict was denied, and judgment based on the jury's verdict was entered for Meade.

The defendants appealed to the Court of Special Appeals and, in a reported opinion, that court reversed the Circuit Court's judgment. The Court of Special Appeals held that the

defendants' motions for judgment and for judgment notwithstanding the verdict should have been granted. *Shangri–La v. Meade*, 181 Md.App. 127, 955 A.2d 834 (2008). The Court of Special Appeals determined that, because "there is no significant difference" between the definitions of "handicap," as used in the Howard County Code, and "disability," as used in the federal Americans with Disabilities Act, "the two statutes should be construed in the same manner." 181 Md.App. at 135, 955 A.2d at 838. The intermediate appellate court primarily relied on federal case law, and particularly United States Supreme Court cases, holding that the term "disability" in the Americans with Disabilities Act should be strictly construed in order to establish a demanding standard. Applying this high standard to Meade's case, the Court of Special Appeals held that no "jury could reasonably have concluded that the major life activities that supported Meade's claim of being handicapped were the activities of socialization and parenting." 181 Md.App. at 143, 955 A.2d at 843. The appellate court stated that, even if the jury had considered parenting and socialization as major life activities impacted by Meade's latex allergy, "Meade presented no evidence that would have permitted the jury to find that her allergy had 'prevent[ed] or severely restrict[ed]' her socialization or parenting." *Ibid.*

Meade petitioned this Court for a writ of certiorari, which was granted. *Meade v. Shangri–La*, 406 Md. 744, 962 A.2d 370 (2008). In her petition, she asked this Court to address the issue of whether the Court of Special Appeals had erred by construing the definition of "handicap," as used in the Howard County Code, in the same manner as federal courts had construed the definition of "disability," as used in the federal Americans with Disabilities Act. The defendants filed no cross-petition for a writ of certiorari.

II.

■ We disagree with the Court of Special Appeals' holding that the Circuit Court for Howard County should have " 'strictly' " interpreted the definition of "handicap" in order " 'to create a demanding standard for qualifying as disabled' "

as the Supreme Court had done with regard to the term "disability" in the federal Americans with Disabilities Act. *Shangri–La v. Meade, supra,* 181 Md.App. at 137, 955 A.2d at 839, *quoting Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 691, 151 L.Ed.2d 615, 631 (2002). *See also Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). While, under some circumstances, the Supreme Court's interpretation of a federal statute may be helpful in construing a similar Maryland statute, such is not the case with regard to the statutory provisions here involved. Despite the similarity in wording,[6] there are significant differences between the federal cases under the Americans with Disabilities Act, relied on by the Court of Special Appeals, and an action under former Article 49B, § 42,[7] coupled with the relevant Howard County Code provisions.

At the outset, it is important to point out that the Americans with Disabilities Act does not use the term "handicap" and, therefore, does not define that word. The relevant provisions of the Howard County Code, on the other hand, do not use the word "disability." When the Howard County Code was updated in 1991 to ensure compliance with the Fair Housing Amendments Act of 1988, a memorandum from the Howard County Disabilities Services Coordinator to the Howard County Council noted that "[w]e regret that the use of the word 'handicapped' could not be updated to 'disability' as used in the Americans with Disabilities Act . . . . [but] we concur

---

6. The Americans with Disabilities Act, 42 U.S.C. § 12102, as amended in 2008, defines "disability" as follows:
 "§ 12102. **Definition of disability**
 As used in this chapter:
 (1) Disability. The term 'disability' means, with respect to an individual—
 (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
 (B) a record of such an impairment; or
 (C) being regarded as having such an impairment. . . ."
 *Compare* § 12.201 of the Howard County Code, *see* n. 3, *supra.*

7. Now § 20–1202 of the State Government Article.

with the Office of Law that such a change may pose unexpected problems."

In addition, § 12.201 of the Howard County Code, containing the definition of "Handicap," *see* n. 3, *supra*, provides that "[w]ords and phrases used in this subtitle shall have their usual meaning. . . ." Thus, the phrases "physical or mental impairment," "substantially limits," and "one or more of the individual's major life activities," used in the Howard County Code to define "handicap," must be given their "usual meaning." The "usual meaning" of a statutory term is its meaning under the " 'ordinary, popular understanding of the English language,' " *Adventist Health v. Health Care Commission*, 392 Md. 103, 124 n. 13, 896 A.2d 320, 333 n. 13 (2006), quoting *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004). Under the ordinary, popular understanding of the language in § 12.201 of the Howard County Code, and in light of the evidence, a jury could properly find that Lisa Meade's allergy to latex was an "impairment which substantially limit[ed]" Meade's socialization, parenting and interaction with her son's education. This is in sharp contrast with the "demanding standard," which requires that terms be "interpreted strictly," set forth in *Toyota Motor Mfg., Ky., Inc. v. Williams, supra*, 534 U.S. at 197, 122 S.Ct. at 691, 151 L.Ed.2d at 631.

This Court has also indicated that statutory actions like the present one are to be liberally construed in favor of the person claiming to be the victim of discrimination. As previously pointed out, this was not simply an action under a local antidiscrimination statute. Rather, it was an action under a State statute, former Article 49B, § 42, coupled with an enactment by one of three counties (Montgomery County, Prince George's County, or Howard County). The basic authorization to "maintain a civil action against [a] person who committed the alleged discriminatory act" was set forth in the State statute, Article 49B, § 42(a).[8] Nevertheless, the "dis-

---

**8.** Article 49B, § 42, was enacted in response to certain decisions of this Court. For the historical background, *see H.P. White Laboratory, Inc. v.*

criminating act" had to be prohibited by the county code of Montgomery, Prince George's or Howard Counties. This Court, in *Haas v. Lockheed Martin,* 396 Md. 469, 495, 914 A.2d 735, 750–751 (2007), held that Article 49B, § 42, which always must be coupled with a county code provision, was "a remedial statute" and "should be construed liberally in favor of claimants seeking . . . protection." Again, this construction of the Maryland statutory provisions in *Haas* is flatly inconsistent with the very narrow construction of the Americans with Disabilities Act mandated by the Supreme Court in *Toyota Motor Mfg. Ky., Inc. v. Williams, supra,* and *Sutton v. United Air Lines, supra.*

The Court in *Haas,* 396 Md. at 492, 914 A.2d at 749, also held that the Court of Special Appeals in that case erred by "relying on federal decisional law construing" federal statutes instead of engaging in an "analysis of the meaning of the terms used in the Maryland enactments." The *Haas* opinion went on to state "that the commonly understood, plain meaning of" the disputed language in the Maryland statute differed from the federal courts' construction of similar language in federal statutes. *Ibid.* We rejected the holdings of the federal cases relied on by the Court of Special Appeals. The same conclusion is applicable in the present case.

Another reason for not following the Supreme Court's construction of the Americans with Disabilities Act set forth in *Toyota Motor Mfg. Ky., Inc. v. Williams, supra,* and *Sutton v. United Air Lines, supra,* is that those cases, and the construction of "disability" therein, were explicitly repudiated by Congress in 2008. In the "ADA Amendments Act of 2008," Pub.L. 110–325, 122 Stat. 3553, codified as 42 U.S.C. (2006 Edition, Supp. III), § 12101 *et seq.,* Congress provided, *inter alia,* in 42 U.S.C. § 12102(4)(A) as follows:

---

*Blackburn,* 372 Md. 160, 167–171 and n. 4, 812 A.2d 305, 311 and n. 4 (2002); *McCrory Corp. v. Fowler,* 319 Md. 12, 570 A.2d 834 (1990); *Sweeney v. Hartz Mountain Corp.,* 319 Md. 440, 573 A.2d 32 (1990).

"(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter...."

In "Findings and Purposes of Pub.L. 110–325," following 42 U.S.C. § 12101 (2006, Supp.III), at p. 177, Congress stated in part:

" '(a) FINDINGS.—Congress finds that—

'(1) in enacting the Americans with Disabilities Act of 1990(ADA) [42 U.S.C. 12101 et seq.], Congress intended that the Act "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and provide broad coverage;

\* \* \*

'(3) while Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973 [29 U.S.C. 701 et seq.], that expectation has not been fulfilled;

'(4) the holdings of the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471[, 119 S.Ct. 2139, 144 L.Ed.2d 450] (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;

'(5) the holding of the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184[, 122 S.Ct. 681, 151 L.Ed.2d 615] (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;

'(6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;

'(7) in particular, the Supreme Court, in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184[, 122 S.Ct. 681] 151 L.Ed.2d 615 (2002), inter-

preted the term "substantially limits" to require a greater degree of limitation than was intended by Congress....' "

Congress in the 2008 Act enacted several provisions in an effort to ensure a broad interpretation of "disability" in the Americans with Disabilities Act.

■ We shall assume, *arguendo*, that the trial judge correctly held that the evidence was insufficient to uphold the jury's verdict based on Meade's breathing difficulties. Nonetheless, the evidence in this case clearly supports the jury's conclusion that Meade's latex allergy was a handicap which damaged, weakened, or diminished her ability to interact with her son at school, as well as her ability to socialize with the teachers and other students. Meade repeatedly emphasized during her testimony that she wished to play a larger role in her son's education. As she wrote in a letter to Dr. Ghosh, she wanted to "enter the building, see his classroom, meet with his teachers, and attend functions," but she was unable to do so for fear of her allergic reactions.

In her testimony, Meade identified numerous ways that the school's failure to use non-powdered latex gloves impacted her interactions with the school and with her son. She detailed how she would spend as little time as possible in the school while the teachers were still using the powdered gloves and that, after the school requested her to withdraw her son, "it was difficult" because she was forced to change her work hours and take days off to provide child care. Meade's testimony also focused on how the school's actions impacted her relationship with her son. His withdrawal from the school made him

> "irritable [and] very clingy. He didn't understand why he wasn't going back.... [T]he school was his first social environment away from home. * * * He was having fun there. He didn't understand why he couldn't go back. He had made friends. He was ... doing neat things. He was very upset and just couldn't understand why he couldn't go back there."

When Meade eventually did find a new school that did not use latex gloves and enrolled her son, she noted that his behavior had changed and that

"[h]e did not want to go there. He was clingy, crying. It took ... a staff member to peel him off of either myself or his dad who was dropping him off, whoever was dropping him off at the time. And we had to physically leave the building with him just sobbing and reaching out to us."

Meade explained the impact of her son's reaction on her:

"I would leave [the new school], but I was upset. I didn't want to leave him there like that, so I wanted to make sure he settled down, so I stayed out of his view and watched to see if he would stop crying and settle down. He eventually would stop crying and settle down, but he didn't—it was just—he would sit. Where he was told to sit, he sat. He didn't interact with the other children. He didn't get up and play with the other children. His lunch box would come home with his lunch in it still, so he hadn't eaten. He expressed he did not want to go back."

Meade further testified that removing her son from the school was

"very stressful. I was upset. I was scared. I was angry at the situation. It required upheaval of the household with finding care for him, worrying about where I was going to ultimately find care for him, not just the immediate care for him. Switching work schedules, taking time off from work ... I was nervous. I was upset. I couldn't sleep. I'd be physically tired and go to bed early, and then I couldn't ... fall asleep. I was irritable. I was unable to concentrate. It affected my work where I was ... going ... to take care of patients, and I couldn't concentrate on what I was doing. I was withdrawn from my husband and my kids at the time. I was anxious. I was shaky. Sometimes I wouldn't eat. Other times, I would binge eat."

When asked specifically what stress she faced as a result of changing day care providers, she stated:

"The stress I suffered was the emotional turmoil of the finances, [and] the family's struggles to make arrangements, to find another place that I wanted my son to go to be cared for in my absence. The stress of him not being happy, and his behavior changes and irritability and life changes that I had to accommodate and work with."

She also testified that

"it made me feel terrible that [her son] had to be moved from a [school] that I really liked to another place I didn't like, that I felt was sub-standard to what I wanted for my child. And I had to deal with his crying and not wanting to separate from me and not wanting to stay where he was going. * * * I had to deal with . . . the pain of seeing him like that."

In determining that Meade was able to rely on socialization and parenting as major life activities to support her handicap claim, the trial judge relied on *University of Maryland v. Boyd, supra,* 93 Md.App. 303, 612 A.2d 305, which involved a man with a disfiguring skin condition. The man alleged that he was physically handicapped under former Article 49B, § 16(a) [9] because his skin condition "significantly impaired [his] ability to socialize." *Boyd,* 93 Md.App. at 317, 612 A.2d at 312. The Court of Special Appeals agreed and noted in particular that the Code of Maryland Regulations, COMAR 14.03.02.03 (1979), explicitly includes "socialization" in its definition of "major life activities." [10] The Court of Special Ap-

---

**9.** Like other sections of Article 49B, § 16 concerning "Discrimination in Employment," was later recodified in §§ 20–601 *et seq.* of the State Government Article.

**10.** This regulation, which was relied on in *University of Maryland v. Boyd,* 93 Md.App. 303, 612 A.2d 305 (1992), is found in the "Anti–Discrimination Relating to Persons with Disabilities" chapter of the "Commission on Human Relations" subtitle. It is unchanged in the present version of the Code of Maryland Regulations. COMAR 14.03.02.02 (2011) currently reads:

".02 **Definitions.**
A. In this chapter, the following terms have the meanings indicated.

peals held that the man had proven that he was handicapped by demonstrating that his skin condition "significantly impairs his ability to socialize, [which is] considered to be a major life activity." 93 Md.App. at 317, 612 A.2d at 313. The holding in *Boyd* is additional support for the judgment of the Circuit Court in the present case.

In sum, the evidence in this case was sufficient for the jury's finding that Lisa Meade's latex allergy was an impairment which substantially limited her major life activities of socialization and parenting, and thus was a "handicap" within the meaning of § 12.201 of the Howard County Code. The evidence was also sufficient to support the jury's finding that Meade had been denied the accommodations of the respondent school because of her handicap and that this constituted discrimination in violation of former Article 49B, § 42, and § 12.210 II of the Howard County Code.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR CONSIDERATION OF THE PETITIONER'S REQUEST FOR ATTORNEY'S FEES FOR APPELLATE WORK.[11] COSTS IN THIS COURT

---

B. Terms Defined.

\* \* \*

(7) 'Major life activities' includes, but is not limited to, functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, driving a vehicle, socializing, and engaging in procreation and recreation."

Notably, even this definition of "major life activities" indicates that term is not "limited to" those activities listed.

11. The petitioner has requested appellate attorney's fees if she prevails in this Court, and § 12.217 II of the Howard County Code authorizes an award of attorney's fees. *See Monmouth Meadows v. Hamilton,* 416 Md. 325, 7 A.3d 1 (2010); *Henriquez v. Henriquez,* 413 Md. 287, 294, 992 A.2d 446, 450–451 (2010); *Friolo v. Frankel,* 403 Md. 443, 942 A.2d 1242 (2008).

AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.

BATTAGLIA, ADKINS, and RAKER, JJ., Dissent.

ADKINS, J., dissenting, in which BATTAGLIA, J., joins.

Although I deeply value the importance of the ADA and similar statutes, I am more cautious than my colleagues in interpreting and applying this County law because I fear that the Majority's open-ended, uncritical approach to disability claims creates worrisome precedent, without giving citizens, organizations, lawyers, or judges the guidance they need. The majority relies on the doctrine advising liberal interpretation of remedial legislation, without assessing the boundaries of that interpretative tool.

In its analysis section (II), the majority rejects Federal court interpretation of the ADA, making the dubious distinction that the County Code uses the term "handicap," whereas the ADA uses the word "disability." Maj. Op. at 486–88, 36 A.3d at 489–90. Yet it fails to explain the meaningful difference between "handicap" and "disability." More importantly, the debate here is not about a possible difference between "handicap" and "disability," but rather, over how to interpret "substantial limitation" and "major life activities," terms appearing in both the ADA and the County law.

We are certainly free to apply a more liberal reading to the County law than to the ADA, and our cases are legion with the principle that we interpret remedial statutes "liberally in favor of claimants seeking ... protection." Maj. Op. at 489, 36 A.3d at 491. But there are limits to this doctrine. *See, e.g., In re Roger S.,* 338 Md. 385, 393, 658 A.2d 696, 700 (1995) ("Even a remedial statute should not be construed so broadly as to create the possibility of results that are unreasonable, illogical, or inconsistent with common sense." (citations and quotation marks omitted)). The majority offers no standard for determining which claimants will qualify for relief and which will not, except by relying on the "ordinary, popular understanding" of the general words in the County law. I submit that

these words, "physical or mental impairment which substantially limits one or more of the individual's major life activities," are very general terms that call for interpretation by the Court. In particular, the statutory requirement that a limitation be "substantial" should not be entirely up to the discretion of the jury, as the Majority impliedly holds. In so doing, the Majority declines to subject Meade's claim to a rigorous legal standard.

The impact and implications of the Majority's decision should not be underestimated.[12] It is far-reaching, I submit, because a large segment of the population has some health condition that impairs their ability to function fully in all the activities that they may deem highly desirable. And yet, surely not all of these people should be encouraged to file disability discrimination claims. For example, many people suffer serious allergies to airborne particles of weeds, trees, flowers, etc., and may not be able to watch their children's soccer or baseball games in the fall or spring. Yet, these people are not disabled such that they qualify for accommodations—such as moving indoors or constructing a special air-controlled viewing booth beside each playing field. A person with claustrophobia may not be able to fly on crowded airplanes, despite traveling well by other means. Surely that person is not disabled, such that he is entitled to disability benefits, because there are no separate, spacious cabins for only him and a few others to occupy. A person may have a serious allergy to perfumes; yet this is not a disability that would require a department store to make accommodations, such as to halt sale of those products or to build a special room in order to allow the allergic person to shop there. The same can be said about a person with food allergies and restaurants who sell those foods. Other, and perhaps better, examples can be identified.

As a Court, we need to be more careful in analyzing what is a **substantial** impairment of a major life activity. We should

---

12. As written, the Majority opinion suggests a state-wide standard, with implications for any disability claim.

consider the extensive litigation spawned by the almost identical ADA, much of it based on non-qualifying claims. Although we need not be in lockstep with Federal courts' interpretation of the ADA, we should at least take heed from their attempts to flesh out the legislative meaning of the general terms "substantially limits" and "major life activity." [13] Given the generality of the statutory terms in question, the meaning of "substantial limitation" and "major life activity" should not be decided on a jury-by-jury basis.

This case requires deciding (1) whether parenting is a "major life activity"; and (2) whether Meade's allergy to latex creates a "substantial limitation" on her parenting activity. As to the first issue, I lean towards the view that parenting is a "major life activity." *See Abbott v. Bragdon,* 107 F.3d 934, 942 (1st Cir.1997), *aff'd,* 524 U.S. 624, 655, 118 S.Ct. 2196, 2213, 141 L.Ed.2d 540 (1998) ("Ms. Abbott faces the unfortunate reality that even if she gives birth to a healthy child, she probably will not live long enough to complete the task of raising the child to adulthood. We thus hold that HIV-positive status is a physical impairment that substantially limits a fecund woman's major life activity of reproduction. Ms. Abbott therefore is disabled within the purview of the ADA."); *see also Emory v. AstraZeneca Pharm LP,* 401 F.3d 174, 180–81 (3d Cir.2005) (relying in part on the plaintiff's inability to raise his children to conclude that a rational factfinder could find him disabled under the ADA); *MX Group, Inc. v. City of Covington,* 293 F.3d 326, 337 (6th Cir.2002) (listing "parenting" as a major life activity under the ADA); *Cain v. Hyatt,* 734 F.Supp. 671, 679 (E.D.Pa.1990) ("[A] significant injury to the reproductive system impedes a major life activity. The interests in conceiving and raising

---

13. Norman J. Singer, in the treatise *Statutes and Statutory Construction,* explains: "It is the role of the judiciary to construe legislation not solely for the purpose of resolving a particular controversy but also to demonstrate the operation and effect of certain statutory language so that the citizenry can better comply with the law and the legislature can better construct the law." 2A Norman J. Singer & J.D. Shambie Singer, Statutes & Statutory Construction § 45:3 (7th ed.2007).

one's own children have been deemed essential, basic civil liberties of man, and rights far more precious ... than property rights." (citations and quotation marks omitted)).[14]

Nevertheless, assuming that parenting is a "major life activity," we must determine what counts as a "substantial limitation" on parenting. The Majority just ignores the word "substantial." Whether a claimant has met this qualifier is not simply for the jury to decide as a matter of fact. If it were, both claimants, and the businesses and organizations they sue, would have virtually no standard for differentiating acceptable and unacceptable conduct in terms of dealing with people's differences in health status. Certainly, to meet the "substantial limitation" test, the alleged disability must do more than infringe on one aspect of parenting, or cause a parent to suffer inconvenience or expense, when the claimant still enjoys the majority of the parenting experience. *Cf. Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir.1998) ("Evidence of disqualification from a single position or a narrow range of jobs will not support a finding that an individual is substantially limited from the major life activity of working."); *Chandler v. City of Dallas*, 2 F.3d 1385, 1392 (5th Cir.1993) ("[I]n determining whether a given impairment

---

**14.** *But see Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 677 (8th Cir.1996) ("We hold that the District Court properly concluded that reproduction and caring for others are not cognizable major life activities under the ADA."); *Zatarain v. WDSU–Television, Inc.*, 881 F.Supp. 240, 243 (E.D.La.1995), *aff'd*, 79 F.3d 1143 (5th Cir.1996) ("[F]inding 'reproduction' to be a 'major life activity' would be inconsistent with the illustrative list of major life activities provided in the ADA regulations.").

Moreover, it is not entirely clear that parenting is a "major life activity" in a cause of action pursuant to the Howard County Code. The latter defines "major life activities" to be "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working[,]" and does not include procreation or parenting, or even socialization. Howard County Code § 12.400(c). Yet, regulations issued under the state law, Md.Code (2003), Article 49B, include both socialization and procreation. *See* COMAR 14.03.02.02(B)(7) (" 'Major life activities' includes, but is not limited to, functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, driving a vehicle, socializing, and engaging in procreation and recreation.").

substantially limits an individual's employment potential [a court should consider] the number and type of jobs from which the individual was disqualified, the geographic area to which he has reasonable access, and the individual's employment qualifications.... An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one." (citations and quotation marks omitted)).

The only proof offered by Meade is that she cannot enter this preschool program to observe her young child participate in some unspecified activity. I say unspecified because, if the child is in diapers, he is unable to participate in the gymnastics program she cited as an example of what she would miss. *See* Maj. Op. at 484–85, 36 A.3d at 488. In order to show that her allergy is a disability that impairs parenting, she must offer proof that by not being able to come inside the school she has lost out on a substantial part of parenting. Observing one's child interact with other children at school, at any age, is an enjoyable part of parenting, but Meade has failed to show what activities a nursery-aged child would engage in, which she could not see elsewhere, that would amount to a substantial limitation on her parenting.

Moreover, Meade failed to show that other nursery schools not using latex, were unavailable to her and her child. Like the claimant in *Sherrod* who showed disqualification from a narrow range of jobs, Meade has made no showing that most nursery schools use latex gloves with powder, as Children's Manor Montessori School does. Additionally, as her child leaves the age of nursery school, and will no longer wear diapers, the latex allergy will no longer interfere with her parenting at all, and thus lacks permanence.

The Court of Special Appeals succinctly summarized and commented on her testimony about her latex allergy:

Meade testified that she can control her latex allergy by avoiding certain products. For example, she testified that she stopped using latex gloves at work, and her employer stopped using powdered latex gloves. When asked if she

changed any other aspects of [her] life as a result of the diagnosis, Ms. Meade said:

Yes; ... latex is in many areas of our environment. Balloons are latex; I cannot touch or have balloons in my home. Erasers on pencils are latex; I have to use special—or, my children have to use special erasers for their schoolwork. Rubber bands are latex; I can't have rubber bands or touch a rubber band. I use another kind of product called a plastic band as a substitute. Cleaning gloves for doing routine housework cannot be—the typical yellow latex gloves, because those are latex. Those are a few examples.

Ms. Meade also described the few times she had accidentally been exposed to latex after she learned of her allergy. These incidents occurred as a result of: eating at a restaurant in which the employees use latex gloves to handle the food, visiting her mother at a hospital, taking her son to the dentist, hugging her husband after he came home from the dentist, and having her blood drawn. But these instances of accidental exposure were relatively infrequent, and on none of those occasions was her reaction serious enough that she had to go to the hospital. Instead, she simply treated the allergic reaction with an inhaler. There was no evidence that Meade's breathing was at all limited when she was not exposed to latex. Meade admitted that she never experienced any allergic reactions to latex while actually at the Children's Manor school.

*Shangri-La Ltd. P'ship v. Meade,* 181 Md.App. 127, 140–41, 955 A.2d 834, 841–42 (2008). This evidence is not sufficient to show a substantial limitation on her parenting.

The Majority justifies its decision that Meade's allergy can be considered a substantial limitation on her parenting ability by comparison to the decision of the intermediate appellate court in *Univ. of Md. at Balt. v. Boyd,* 93 Md.App. 303, 612 A.2d 305 (1992). Maj. Op at 493–94, 36 A.3d at 493–94. Notably, the Majority offers no analysis explaining why the two cases are comparable or what *Boyd* teaches us. Boyd had a disfigurement caused by shaving, so that the conditions of

his employment—namely, that he shave—meant he carried this disfigurement around with him at all times. *Id.* at 316–17, 612 A.2d 305. This condition embarrassed him so much that he would not go out in public. *Id.* This likely meant that he did not mingle with friends, play sports, attend sporting events, walk in the park, go to the movies, theater, or concerts, or occupy himself with the myriad of activities that people enjoy. Unlike *Boyd,* Meade's allergy to latex occurs only when she is directly exposed and would have no impact on her socialization. Indeed, as the Court of Special Appeals pointed out, Meade admitted that she never experienced any allergic reactions to latex while at the Children's Manor school. *Shangri–La,* 181 Md.App. at 141, 955 A.2d at 841–42.

For the foregoing reasons, I dissent, on grounds that Meade failed to prove that she suffered a substantial limitation of a major life activity. I would affirm the judgment of the Court of Special Appeals.

Judge BATTAGLIA authorizes me to state that she joins the views expressed here.

RAKER, J. dissenting.

I would affirm the judgment of the Court of Special Appeals for all of the reasons set forth in *Shangri–La Limited Partnership v. Meade,* 181 Md.App. 127, 955 A.2d 834 (2008).

The complaint did not allege that Meade's allergy impaired her major life activities of parenting and socialization. The complaint made reference only to "major life activities including breathing." There was no reference to parenting or socialization. Indeed, counsel said nothing "about any limitation upon Meade's ability to engage in the major life activities of socialization or parenting." *Id.* at 142, 955 A.2d at 843. The Court of Special Appeals noted as follows:

"The complaint did not allege that the allergy also impaired the major life activities of parenting and socialization. During opening statements, Meade's counsel argued that Meade's 'latex allergy affects, among other things, her breathing.' Not only did Meade fail to produce sufficient

evidence to show that her ability to socialize and parenting were substantially limited, these major life activities were never mentioned to the jury by Meade's counsel during closing arguments. In his closing argument, Meade's counsel asserted:

'You're going to be called upon to apply the law to the facts. You've heard me summarize the facts. Let's talk about how it applies to the law. She has [a] handicap—is [sic] her latex allergy. It affects a major life function. Her breathing. There are many major life functions. Walking. Talking. Being able to move about uninhibited. Being able to hear, being able to see. And being able to breathe. I don't know if I could characterize one as more important than the other, but I would certainly characteriz[e] breathing as a major life function.' "

*Id.* at 142, 955 A.2d at 842 (alterations in original).

The Court of Special Appeals held that the trial court erred in basing its denial of the motion for judgment notwithstanding the verdict ("JNOV") on the possibility that the jury made a finding that a major life activity other than breathing was impaired. *Id.* at 143, 955 A.2d at 843. The intermediate appellate court reasoned as follows:

"We fail to see how the jury could reasonably have concluded that the major life activities that supported Meade's claim of being handicapped were the activities of socialization and parenting. But even if the jury had been sufficiently creative to consider such alternative possibilities, the evidence of any limitation upon Meade's activities was even more sparse with regard to socialization and parenting. As the Supreme Court stated in [*Toyota Motor Manufacturing, Kentucky v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 691, 151 L.Ed.2d 615, 631 (2002) ], quoted above, in order for a person to be considered disabled, the limitation upon the pertinent major life activities must be more than a series of inconveniences. Instead, '*an individual must have an impairment that prevents or severely restricts* the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must

also be permanent or long term.' (Emphasis added.) Meade presented no evidence that would have permitted the jury to find that her allergy had 'prevent[ed] or severely restrict[ed]' her socialization or parenting. Consequently, the trial court erred in basing its denial of the motion for JNOV on the possibility that the jury made a finding that a major life activity other than breathing was impaired."

*Id.* I agree, and hence, would affirm the decision of the Court of Special Appeals.

Judge BATTAGLIA authorizes me to state that she joins the views expressed here.